**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| XR COMMUNICATIONS, LLC, dba VIVATO TECHNOLOGIES,<br><br>Plaintiff,<br>v.<br>WALMART INC.; WAL-MART STORES TEXAS, LLC; AND WAL-MART.COM USA, LLC,<br>Defendants. | Case No. 2:26-cv- 01046<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq.*, in which Plaintiff XR Communications LLC d/b/a Vivato Technologies ("Plaintiff" or "Vivato") makes the following allegations against Defendants Walmart Inc., Wal-Mart Stores Texas, LLC, and Wal-Mart.com USA, LLC (collectively, "Defendants" or "Walmart"):

## INTRODUCTION

1. This complaint arises from Defendants' unlawful infringement of United States Patent No. 8,289,939 (the "'939 Patent" or the "Asserted Patent"), which generally relates to wireless communication technology and, in particular, to coordinating signal transmission and reception among multiple wireless access points. Walmart sells, offers to sell, and uses Wi-Fi 7 wireless routers, mesh Wi-Fi systems, and range extenders that practice the '939 Patent, both in its thousands of Walmart Supercenters, Discount Stores, and Neighborhood Markets (including dozens of stores in this District) and through its www.walmart.com website and the Walmart mobile application. Walmart's own product summary for one of those routers tells its customers

that the router "[i]ncludes Multi-Link Operation (MLO) for increased throughput and reduced latency," the very Wi-Fi 7 functionality that practices the '939 Patent.

2. Countless electronic devices today connect to the Internet wirelessly. Beyond just connecting our devices together, wireless networks have become an inseparable part of our lives in our homes, our offices, and our neighborhood coffee shops. In even our most crowded spaces, today's wireless technology allows all of us to communicate with each other, on our own devices, at virtually the same time. Our connected world would be unrecognizable without the ubiquity of sophisticated wireless networking technology.

3. Just a few decades ago, wireless technology of this kind could only be found in science fiction. The underlying science behind wireless communications can be traced back to the development of "wireless telegraphy" in the nineteenth century. Guglielmo Marconi is credited with developing the first practical radio, and in 1896, Guglielmo Marconi was awarded British patent 12039, Improvements in transmitting electrical impulses and signals and in apparatus therefor, the first patent to issue for a Herzian wave-based wireless telegraphic system. Marconi would go on to win the Nobel Prize in Physics in 1909 for his contributions to the field.

4. One of Marconi's preeminent contemporaries was Dr. Karl Ferdinand Braun, who shared the 1909 Nobel Prize in Physics with Marconi. In his Nobel lecture dated December 11, 1909, Braun explained that he was inspired to work on wireless technology by Marconi's own experiments. Braun had observed that the signal strength in Marconi's radio was limited beyond a certain distance, and wondered why increasing the voltage on Marconi's radio did not result in a stronger transmission at greater distances. Braun thus dedicated himself to developing wireless devices with a stronger, more effective transmission capability.

5. In 1905, Braun invented the first phased array antenna. This phased array antenna

featured three antennas carefully positioned relative to one another with a specific phase relationship so that the radio waves output from each antenna could add together to increase radiation in a desired direction. This design allowed Braun's phased array antenna to transmit a directed signal.

6. Building on the fundamental breakthrough that radio transmissions can be *directed* according to a specific radiation pattern through the use of a phased array antenna, directed wireless communication technology has developed many applications over the years. Braun's invention led to further developments in radar, smart antennas, and, eventually, to a technology known as "MIMO," or "multiple-input, multiple-output," which would ultimately allow a single radio channel to receive and transmit multiple data signals simultaneously. Along the way, engineers have worked tirelessly to overcome limitations and roadblocks directed wireless communication technology.

7. At the beginning of the twenty-first century, the vast majority of wireless networks still did not yet take advantage of directed wireless communications. Instead, "omnidirectional" access points and base stations were ubiquitous. Omnidirectional base stations transmit radio waves uniformly around the base station in every direction and do not steer the signal in particular directions. Omnidirectional antenna base stations do typically achieve 360 degrees of coverage around the base station, but with a reduced coverage distance. Omnidirectional base stations also lack sophisticated approaches to overcome certain types of interference in the environment. As only one example, the presence of solid obstructions, such as a building, can limit signal penetration. As another example, interference arises when radio waves are reflected, refracted, or diffracted based on obstacles present between the transmitter and receiver. The multiple paths that radio waves can travel between the transmitter and receiver often result in signal interference that

decreases performance, and omnidirectional base stations lack advanced solutions to overcome these "multipath" effects.

8. Moving from omnidirectional networks to modern networks has required an additional series of advancements that harness the capabilities of directed wireless technology. These advancements range from conceiving various ways to steer and modify radiation patterns, to enhancing the transmission signal power in a desired direction, to suppressing radiation in undesired directions, to minimizing signal "noise," and then applying these new approaches into communications networks with multiple, heterogenous transmitters and receivers.

9. Harnessing the capabilities of directed wireless technology resulted in a significant leap forward in the signal strength, reliability, concurrent users, and/or data transmission capability of a wireless network. One of the fundamental building blocks of this latest transition was the development of improvements to MIMO and "beamforming," and to the coordination of transmission and reception among multiple access points, which are the subject matter of the patent in this infringement action that resulted from the investment of tens of millions of dollars and years of tireless effort by a group of engineers who built a technology company slightly ahead of its time. Their patented innovations laid the groundwork for today's networks, including the Wi-Fi 7 products that Walmart sells, and are infringed by Defendants.

## THE PARTIES

10. Plaintiff XR Communications, LLC, d/b/a Vivato Technologies ("Vivato" or "Plaintiff") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 2802 Wildcreek Ct., Keller, TX 76248. Vivato is the sole owner by assignment of all right, title, and interest in the Asserted Patent.

11. Vivato was founded in 2000 as an $80+ million venture-backed company with

several key innovators in the wireless communication field including Siavash Alamouti, Ken Biba, William Crilly, James Brennan, Edward Casas, and Vahid Tarokh, among many others. At that time, "Wi-Fi" or "802.11" had become the prominent means of wireless connection to the Internet, integrated into hundreds of millions of mobile devices globally. Vivato was founded to leverage its talent to generate intellectual property and deliver Wi-Fi/802.11 wireless connectivity solutions to service the growing demand for bandwidth.

12. Vivato has accomplished significant innovations in the field of wireless communications technology. One area of focus at Vivato was the development of advanced wireless systems with sophisticated antenna designs to improve wireless speed, coverage, and reliability. Vivato also focused on designing wireless systems that maximize the efficient use of spectrum and wireless resources for large numbers of connected mobile devices. Ultimately, Vivato's accomplishments expanded beyond "Wi-Fi" and "802.11"-based networks.

13. Vivato's inventions and technology, particularly relating to "MIMO" and beamforming, also apply to wireless communication apart from WiFi, such as communication using cellular networks. Indeed, Vivato's earliest products focused on achieving wireless communication over much longer ranges (i.e., several miles) as compared to a traditional 802.11 Wi-Fi access point.

14. Among many fundamental breakthroughs achieved by Vivato are inventions that allow for intelligent and adaptive beamforming based on up-to-date information about the wireless medium, as well as adaptive beamforming in larger base stations accommodating many beams and many users. Through these and many other inventions, Vivato's engineers pioneered a wireless technology that provides for simultaneous transmission and reception, a significant leap forward over conventional wireless technology.

15. Over the years, Vivato has developed proven technology, with over 400 deployments globally, including private, public and government, and it has become a recognized provider of extended range wireless network infrastructure solutions. Vivato's wireless base stations integrate beamforming phased array antenna design with packet steering technology to deliver high-bandwidth extended range connections to serve multiple users and multiple devices.

16. Vivato's patent portfolio includes over 17 issued patents and pending patent applications. The patented technology at issue in this case is directed to specific aspects of wireless communication, including the coordination of signal transmission and reception among a plurality of wireless access points.

17. On information and belief, Defendant Walmart Inc. ("Walmart Inc.") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1 Customer Drive, Bentonville, Arkansas 72716. Walmart Inc. is, directly or indirectly, the ultimate parent of each of the other Defendants. On information and belief, Walmart Inc. is registered to do business in Texas and may be served through its registered agent for service in Texas, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

18. On information and belief, Defendant Wal-Mart Stores Texas, LLC ("Walmart Texas") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Bentonville, Arkansas. Walmart Texas is an indirect, wholly owned subsidiary of Walmart Inc.: Walmart Inc.'s annual report for the fiscal year ended January 31, 2026 lists "Wal-Mart Stores Texas, LLC" among the "Significant Subsidiaries of Walmart Inc.," as a Delaware entity in which Walmart Inc. owns, directly or indirectly, 100% of the equity securities and which does business under the name "Walmart." See https://www.sec.gov/Archives/edgar/data/104169/000010416926000055/wmtexhibit21fy26.htm.

On information and belief, Walmart Texas's sole member is Wal-Mart Real Estate Business Trust, whose chain of ownership runs through Wal-Mart Property Co., Wal-Mart Stores East, LP, and Wal-Mart Stores East, LLC to Walmart Inc. (formerly Wal-Mart Stores, Inc.). *See Dawson v. Wal-Mart Stores, Inc.*, No. 4:23-cv-00458-SDJ, Dkt. No. 5 at 2, 7 (E.D. Tex. June 30, 2023) (quoting a co-defendant's notice of removal and finding that Wal-Mart Stores Texas, LLC "is comprised of its single member Wal-Mart Real Estate Trust, a Delaware statutory business trust owned entirely by Wal-Mart Property Co."). On information and belief, Walmart Texas owns or leases, operates, and staffs the Walmart Supercenters, Discount Stores, and Neighborhood Markets in Texas, including the stores in this District identified below. The Texas Comptroller of Public Accounts' records of active sales tax permit holders list each of those stores as an outlet of Wal-Mart Stores Texas, LLC. See https://data.texas.gov/Government-and-Taxes/Active-Sales-Tax-Permit-Holders/jrea-zgmq. On information and belief, Walmart Texas is registered to do business in Texas and may be served through its registered agent for service in Texas, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

19. On information and belief, Defendant Wal-Mart.com USA, LLC ("Walmart.com") is a limited liability company organized and existing under the laws of the State of California, with its principal place of business in Bentonville, Arkansas, and is a direct or indirect wholly owned subsidiary of Walmart Inc. Walmart.com operates, together with Walmart Inc., the www.walmart.com website and the Walmart mobile application, through which it sells and ships products to customers throughout the United States, including customers in this District. **On information and belief, Walmart.com is registered to do business in Texas and may be served through its registered agent for service in Texas, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas 75201.**

20. On information and belief, Defendants operate as a single, integrated retail enterprise under the "Walmart" name and brand. Walmart's own Terms of Use for www.walmart.com state that "[w]hen we say 'Walmart,' we mean Wal-Mart.com USA, LLC and Walmart Inc., and any subsidiaries of Wal-Mart Stores, Inc. (including any subsidiaries that Walmart Inc. may form or acquire in the future), and their affiliates, directors, officers, employees and agents." *See* https://www.walmart.com/help/article/walmart-com-terms-of-use/3b75080af40340d6bbd596f116fae5a0 (last updated September 21, 2026). Products ordered on www.walmart.com may be picked up at, delivered from, and returned to Walmart stores, and Walmart Inc. reports the stores, the website, and the resulting revenue as its own. On information and belief, Walmart Inc. directs and controls the activities of its subsidiaries, including the sale and use of the Accused Products described below, and derives revenue from those activities. Defendants collectively provide consumer-electronics products and services, including the Accused Products and the router-setup services described below, to customers throughout the State of Texas, including in the Eastern District of Texas.

## JURISDICTION AND VENUE

21. This action arises under the patent laws of the United States, Title 35 of the United States Code § 1, et seq, including 35 U.S.C. §§ 271, 281, 283, 284, and 285. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

22. This Court has personal jurisdiction over each Defendant in this action because each Defendant has committed acts within this District giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over it would not offend traditional notions of fair play and substantial justice. Defendants, directly and through subsidiaries, agents, or intermediaries, have committed and continue to commit acts of

infringement in this District by, among other things, using, offering to sell, selling, and importing products that infringe the Asserted Patent, and by inducing and contributing to the infringement of the Asserted Patent, in this District. Defendants are, directly and through intermediaries, using, selling, offering for sale, distributing, advertising, promoting, and otherwise commercializing the Accused Products in this District, including through the Walmart stores located in this District and through sales made on www.walmart.com or through the Walmart mobile application to customers in this District. Defendants regularly conduct and solicit business in, engage in other persistent courses of conduct in, and derive substantial revenue from goods and services provided to the residents of this District and the State of Texas. Defendants are subject to jurisdiction pursuant to due process and/or the Texas Long Arm Statute due to their substantial business in this State and District including at least their infringing activities, regularly doing or soliciting business at their Texas facilities, and engaging in persistent conduct and deriving substantial revenues from goods and services provided to residents in the State of Texas including the Eastern District of Texas.

23. Defendants, directly and/or through subsidiaries or intermediaries, have purposefully and voluntarily placed one or more products and/or services in the stream of commerce that practice the Asserted Patent with the intention and expectation that they will be purchased and used by consumers in the Eastern District of Texas. These products and/or services have been and continue to be purchased and used in the Eastern District of Texas.

24. Venue is proper in this District under 28 U.S.C. § 1400(b) because each Defendant has committed acts of infringement in this District and has a regular and established place of business in this District, as set forth below. On information and belief, Defendants are registered to do business in Texas, have transacted business in this District, and have committed acts of direct and indirect infringement in this District by, among other things, using, offering to sell, selling,

and importing products that infringe the Asserted Patent.

25. Walmart operates 595 retail units in Texas (including 395 Walmart Supercenters, 18 Discount Stores, and 96 Neighborhood Markets) and 22 supply chain facilities in Texas, and employs approximately 178,823 associates in the State. *See* https://corporate.walmart.com/about/location-facts/united-states/texas. On information and belief, Walmart Texas owns or leases, operates, staffs, and conducts business from numerous Walmart stores in this District, including stores located at 1701 East End Boulevard North, Marshall, Texas 75670 (Store No. 918); 4006 Estes Parkway, Longview, Texas 75603 (Store No. 3828); 515 East Loop 281, Longview, Texas 75605 (Store No. 398); 2440 Gilmer Road, Longview, Texas 75604 (Store No. 399); 2311 South Jefferson Avenue, Mount Pleasant, Texas 75455 (Store No. 131); 105 Centennial Boulevard, Lindale, Texas 75771 (Store No. 3764); 6801 South Broadway Avenue, Tyler, Texas 75703 (Store No. 2688); 4000 New Boston Road, Texarkana, Texas 75501 (Store No. 2123); 401 East U.S. Highway 82, Sherman, Texas 75092 (Store No. 947); 425 Coit Road, Plano, Texas 75075 (Store No. 3482); 8555 Preston Road, Frisco, Texas 75034 (Store No. 5866); and 730 West Exchange Parkway, Allen, Texas 75013 (Store No. 2918). See **https://www.walmart.com/store-directory/tx.** Each of these stores is a physical, permanent retail location in this District from which Walmart, through its employees, regularly sells and offers to sell consumer electronics to the public, including, on information and belief, the Accused Products, and from which Walmart's customers pick up, receive same-day delivery of, and return products purchased from Walmart. *See, e.g.*, https://www.walmart.com/store/918. For example, as of November 17, 2026, Walmart's product page for the Archer BE9300 offered "Pickup from Marshall Supercenter" and identified the router's location in that store as "Aisle Q28." See https://www.walmart.com/ip/3339006219. Each of these stores is therefore a regular and

established place of business of Walmart Texas, and Walmart Texas has committed acts of infringement including sales and offers for sale of the Accused Products at each of them. On information and belief, Walmart also operates distribution centers in this District, including at 2120 North Stemmons Street, Sanger, Texas 76266 and 8660 South U.S. Highway 79, Palestine, Texas 75803, through which it stocks and distributes products, including, on information and belief, the Accused Products.

26. Walmart.com has committed acts of infringement in this District by selling and offering to sell the Accused Products to customers in this District through www.walmart.com and the Walmart mobile application, including orders shipped to addresses in this District and orders fulfilled through Walmart's pickup, same-day delivery, and ship-from-store programs at the Walmart stores in this District identified above. On information and belief, Walmart.com conducts its business from those stores: online orders are picked, packed, held, handed to customers, delivered, and accepted for return at those stores by personnel who act on behalf of, and subject to the direction and control of, Walmart.com, pursuant to policies that Walmart.com and Walmart Inc. establish for the fulfillment of online orders. The Walmart stores in this District are therefore regular and established places of business of Walmart.com as well. Walmart.com also maintains its own places of business in this District. The Texas Comptroller of Public Accounts' records of active sales tax permit holders list the following outlets of Wal-Mart.com USA, LLC in counties within this District: Walmart Fulfillment Center #3005, 14700 Blue Mound Road, Fort Worth, Texas 76177 (Denton County); Walmart Fulfillment Center #7555, 15101 North Beach Street, Fort Worth, Texas 76177 (Denton County); an outlet at 7701 Windrose Avenue, Plano, Texas 75024 (Collin County); and DC 7027, 14863 FM 645, Palestine, Texas 75803 (Anderson County). See https://data.texas.gov/Government-and-Taxes/Active-Sales-Tax-Permit-Holders/jrea-zgmq.

On information and belief, Walmart.com fulfills orders placed on www.walmart.com and the Walmart mobile application, including orders for the Accused Products, from those facilities, each of which is a regular and established place of business of Walmart.com in this District.

27. Walmart Inc. has committed acts of infringement in this District, directly and through the subsidiaries and agents that it directs and controls, including the sales, offers for sale, and uses of the Accused Products described above, and has ratified the Walmart stores in this District as its own regular and established places of business. Walmart Inc. reports in its annual report for the fiscal year ended January 31, 2026 that "Walmart U.S. is our largest segment and operates 4,611 stores in the U.S., including in all 50 states, Washington D.C. and Puerto Rico"; that Walmart U.S. operates "under the 'Walmart' and 'Walmart Neighborhood Market' brands, as well as walmart.com and the Walmart mobile application"; and that "[s]ubstantially all our stores provide same-day pickup and delivery." *See* https://www.sec.gov/Archives/edgar/data/104169/000010416926000055/wmt-20260131.htm. Walmart Inc. holds out each store in this District to the public as a "Walmart" store on www.walmart.com and on its corporate website, which lists the Texas stores, supply chain facilities, and associates as Walmart's own. On information and belief, Walmart Inc. establishes the merchandising, pricing, store-operations, and services policies under which the Accused Products are sold at those stores and derives the revenue from those sales. On information and belief, Walmart Inc. exercises possession and control over the Walmart stores in this District, which are operated as part of a single, integrated enterprise under Walmart Inc.'s direction and control, such that each Walmart store in this District is a regular and established place of business of Walmart Inc.

28. Walmart Inc. has litigated patent infringement actions in this District through claim

construction and dispositive motions without obtaining dismissal or transfer for improper venue, including an action in which Walmart Texas and Walmart.com were also defendants. *See, e.g.*, *Mobile Equity Corp. v. Walmart Inc.*, No. 2:21-cv-00126-JRG-RSP (E.D. Tex.) (filed April 7, 2021; terminated January 20, 2023); Team Worldwide Corp. v. Wal-Mart Stores, Inc., No. 2:17-cv-00235-JRG (E.D. Tex.) (filed March 29, 2017, against Wal-Mart Stores, Inc., Wal-Mart Stores Texas, LLC, and Wal-Mart.com USA LLC, among others; terminated November 20, 2018).

## WALMART'S INFRINGING WI-FI 7 PRODUCTS AND SERVICES

29. "Wi-Fi 7" is the designation for wireless networking products that implement the IEEE 802.11be amendment to the IEEE 802.11 standard. The Wi-Fi Alliance introduced its Wi-Fi CERTIFIED 7 certification program in 2024. Wi-Fi 7 introduced several new features, including Multi-Link Operation ("MLO"), 320 MHz channels in the 6 GHz band, 4K quadrature amplitude modulation ("4K QAM"), Multiple Resource Units ("Multi-RU"), and preamble (or spectrum) puncturing. *See* https://www.wi-fi.org/discover-wi-fi/wi-fi-certified-7.

30. With MLO, a Wi-Fi 7 access point and a Wi-Fi 7 client device can associate and simultaneously exchange traffic on multiple bands or channels (for example, the 2.4 GHz, 5 GHz, and 6 GHz bands) and the access point coordinates the traffic among those links, including by steering traffic from one link to another, switching links dynamically based on channel conditions, and restraining transmission on one link while another link is being used to receive. MLO "is a mandatory feature for Wi-Fi 7 certification." *See* https://documentation.meraki.com/MR/Wi-Fi_Basics_and_Best_Practices/Wi-Fi_7_(802.11be)_Technical_Guide; https://blogs.cisco.com/networking/wi-fi-7s-multi-link-operation-mlo-dissection-from-packets-to-performance. For example, in the Enhanced Multi-Link Single Radio ("EMLSR") mode of MLO that many Wi-Fi 7 client devices implement, the client listens on multiple links at once and,

depending on the transmit opportunity available on a given link, dynamically switches its radio chains to that link to exchange data, while the access point refrains from transmitting to that client on the other link. Preamble puncturing, likewise a mandatory feature for Wi-Fi 7 certification, allows an access point to "carve out" a portion of a channel that is experiencing interference and to continue transmitting on the remainder of the channel. *Id.*

31. The '939 Patent claims, among other things, an apparatus comprising a wireless input/output unit that is configured to establish a plurality of access points, together with signal transmission/reception coordination logic that monitors those access points for received signals and, upon ascertaining that a first access point is receiving a first signal on a first channel, restrains a second access point from transmitting a second signal on a second, different channel. Wi-Fi 7 routers, mesh systems, and range extenders that implement MLO practice these claims: each establishes a plurality of access points (for example, the 2.4 GHz, 5 GHz, and 6 GHz links of an access-point multi-link device, or the multiple nodes of a Wi-Fi 7 mesh system), monitors those access points for received signals, and restrains transmission on one link or node on one channel while another link or node is receiving on a different channel, as detailed in Exhibit 2.

32. Walmart is one of the largest retailers of consumer Wi-Fi networking equipment in the United States. Walmart sells, offers to sell, and uses Wi-Fi 7 wireless routers, mesh Wi-Fi systems, access points, gateways, and range extenders that support MLO (collectively, the "Accused Products"), in its stores and through www.walmart.com and the Walmart mobile application. The Accused Products include, by way of example and without limitation, the following TP-Link Wi-Fi 7 products that Walmart sells as the seller of record ("Sold and shipped by Walmart.com") and stocks for pickup at its stores: the Archer BE9300 tri-band Wi-Fi 7 router (Walmart item 3339006219); the Archer BE3600 (item 5579991172), Archer BE3200 (item

14178119883), and Archer BE4800 (item 14201904958) dual-band Wi-Fi 7 routers; the Deco WB22000 (Deco 7 Pro BE11000) tri-band mesh Wi-Fi 7 system, 2-pack (item 18158359378); the Deco WB9600 (Deco 7 BE4800) 2-pack (item 18221754243) and Deco WB14400 (Deco 7 BE4800) 3-pack (item 15847315436) dual-band mesh Wi-Fi 7 systems; and the Deco WB7200 (BE3600) 2-pack (item 15822403430) and Deco WB10800 (Deco 7 BE3600) 3-pack (item 5628855463) dual-band mesh Wi-Fi 7 systems; the following Wi-Fi 7 products that Walmart offers for sale on www.walmart.com through the Walmart Marketplace: the MSI Roamii BE Lite (BE5000) dual-band mesh Wi-Fi 7 system, 2-pack and 1-pack (items 12360902665 and 15170604653), and the EnGenius ECW516L tri-band Wi-Fi 7 access point (item 21340314574); together with all other Wi-Fi 7 routers, mesh systems, access points, gateways, and range extenders supporting MLO that Walmart has made, used, sold, offered for sale, or imported, other than any product expressly licensed under the ’939 Patent. The Accused Products in this action do not include products sold through Sam’s Club clubs or www.samsclub.com.

33. Walmart also offers the MSI Roamii BE Lite and EnGenius ECW516L Accused Products identified above for sale and, on information and belief, sells them on www.walmart.com through the Walmart Marketplace. Walmart lists those products on www.walmart.com alongside the products it sells as the seller of record, displays their prices and descriptions, offers the “Walmart Protection Plan by Allstate” with them, and invites customers to buy them at the stated price through Walmart’s “Add to cart” button. On information and belief, Walmart accepts customers’ orders and payments for those products through Walmart’s own shopping cart and checkout. See https://www.walmart.com/ip/MSI-Roamii-Lite-Mesh-System-2-Pack-WiFi-7-5000-5-800-sq-ft-Coverage-Supporting-120-Devices-2-5Gbps-Ethernet-Port-MU-MIMO-MLO/12360902665; https://www.walmart.com/ip/ENGENIUS-CLOUD-MANAGED-

ECW516L-WI-FI-7-LITE-2X3X3-ACCESS-POINT-SUPPORTS-GIG-SPEE/21340314574. Walmart therefore offers to sell and, on information and belief, sells those Accused Products, and at a minimum actively induces and contributes to their infringing sale and use.

34. Walmart markets the Accused Products specifically as "Wi-Fi 7" products and advertises their Wi-Fi 7 capabilities including tri-band operation across the 2.4 GHz, 5 GHz, and 6 GHz bands, multi-gigabit wireless speeds, whole-home mesh coverage, and Multi-Link Operation on its product pages. Walmart's own product summary for the Archer BE9300, which Walmart labels "Generated by AI," touts "Advanced Features: Includes Multi-Link Operation (MLO) for increased throughput and reduced latency" and "6-stream tri-band Wi-Fi with speeds up to 9.2 Gbps (5760Mbps on 6GHz, 2880 Mbps on 5GHz, 574 Mbps on 2.4GHz)." *See* https://www.walmart.com/ip/TP-Link-Archer-BE9300-Router-Tri-Band-WiFi-7-Wireless-Router-up-to-9-2-Gbps-Speeds-Easy-Setup-Parental-Controls/3339006219. Walmart's product page for the Deco WB22000 likewise advertises "Multi-Link Operation for Low Latency & Delays: Route data across multiple bands at once to reduce dropouts and improve responsiveness for cloud gaming, AR/VR, and video calls." *See* https://www.walmart.com/ip/18158359378. Walmart's product listings incorporate the specifications, which tout Multi-Link Operation, 320 MHz channels, 4K-QAM, and Multi-RU, and Walmart distributes the user guides, quick-start guides, and setup applications with each Accused Product it sells. *See, e.g.*, https://www.tp-link.com/us/home-networking/wifi-router/archer-be9300/ ("Multi-Link Operation (MLO): Increases throughput, reduces latency, and improves reliability for emerging applications.").

35. Walmart does not merely sell the Accused Products; it also sells the services by which they are set up, configured, and operated. On its product pages for Accused Products, including the Archer BE9300 and the Deco WB22000, Walmart offers and sells, as an add-on to

the product itself under the heading “Tech Setup,” a “Remote Router Setup” service for $18.00, which Walmart describes as including “Full setup of your router including any configuration as needed,” “Setup of a secure Wi-Fi network,” “Testing of your connection & internet functionality,” “Assistance with router troubleshooting,” and “Tech Coaching to educate you on the full functionalities of your new device,” delivered by Walmart’s service provider, True Network Solutions. *See* https://www.walmart.com/ip/3339006219. Through that service, Walmart causes the Accused Products to be configured and operated in the infringing manner and instructs its customers to do the same. Walmart also sells protection plans for the Accused Products. On information and belief, Walmart further uses the Accused Products in the United States, including by inspecting, testing, and demonstrating them and by processing returned units.

36. Under Walmart’s model, customers may buy the Accused Products in a store, online for shipment to their homes, or online for pickup at or same-day delivery from a store, such that Walmart’s infringing sales of the Accused Products occur in Walmart stores and through www.walmart.com in every state, including in this District.

## COUNT I

## INFRINGEMENT OF U.S. PATENT NO. 8,289,939

37. Vivato realleges and incorporates by reference the foregoing paragraphs as if fully set forth herein.

38. Vivato owns by assignment all rights, title, and interest in U.S. Patent No. 8,289,939, entitled “Signal Communication Coordination.” The ’939 Patent was duly and legally issued by the United States Patent and Trademark Office on October 16, 2012. A true and correct copy of the ’939 Patent is attached as Exhibit 1.

39. Defendants have directly infringed and continue to directly infringe, literally and/or

under the doctrine of equivalents, one or more claims of the ’939 Patent, including at least claim 30, in violation of 35 U.S.C. § 271(a), by making, using, offering to sell, selling, and/or importing into the United States the Accused Products without authorization. Specifically, on information and belief: (a) Walmart Texas has sold, offered to sell, and used the Accused Products in its stores in Texas, including the stores in this District identified above; (b) Walmart.com has sold and offered to sell the Accused Products through www.walmart.com and the Walmart mobile application, including Accused Products listed through the Walmart Marketplace, to customers throughout the United States, including customers in Texas and in this District; and (c) Walmart Inc. has used, offered to sell, sold, and/or imported the Accused Products throughout the United States, directly and through the subsidiaries and agents that it directs and controls, with each such sale also being an infringing sale by the Walmart subsidiary that transacted it. Each of the Accused Products is an apparatus that satisfies the ’939 Patent, including at least every limitation of claim 30, as shown in Exhibit 2. Defendants are liable for infringement of the ’939 Patent pursuant to 35 U.S.C. § 271(a).

40. The Accused Products satisfy all claim limitations of at least claim 30 of the ’939 Patent. Claim charts comparing independent claim 30 of the ’939 Patent (together with dependent claims 33-35 and claims 15, 17) to representative Accused Products are attached as Exhibit 2. Exhibit 2 identifies the Wi-Fi 7 functionality, including Multi-Link Operation, dynamic link switching, and preamble puncturing, by which each Accused Product satisfies each limitation of those claims, and Vivato provides it without the benefit of discovery into the Accused Products.

41. Defendants have had actual knowledge of the ’939 Patent, and of their infringement of the ’939 Patent, at least as of the filing and service of this Complaint, which attaches the ’939 Patent (Exhibit 1) and a detailed claim chart (Exhibit 2) that identifies the Accused Products and

maps each limitation of at least claim 30 of the ’939 Patent to the specific Wi-Fi 7 functionality of those products. Defendants therefore know that the ’939 Patent exists and which of the products they sell infringe, which claims they infringe, and how the Accused Products meet each limitation of those claims.

42. Defendants knowingly and intentionally induce infringement of one or more claims of the ’939 Patent, including at least claim 30, in violation of 35 U.S.C. § 271(b). Despite their knowledge of the ’939 Patent, Defendants continue to actively encourage and instruct their customers and end users to use the Accused Products in ways that directly infringe the ’939 Patent including by installing and operating them as Wi-Fi 7 routers, access points, and mesh systems with Multi-Link Operation enabled. Among other things, Defendants continue to sell and offer to sell the Accused Products; to advertise and promote their Wi-Fi 7, Multi-Link Operation, and mesh capabilities on www.walmart.com, in Walmart’s own product summaries, and in Walmart stores; to distribute with each Accused Product the user guides, quick-start guides, and setup applications that direct customers to install and operate the product as a Wi-Fi 7 router or mesh system; and to sell, alongside the Accused Products, “Remote Router Setup” services that set up and configure the Accused Products for customers and coach customers on “the full functionalities” of the device. On information and belief, Defendants have not modified the Accused Products, their marketing, or their instructions to steer customers toward any non-infringing alternative. Defendants do so knowing and intending that their customers and end users will commit these infringing acts, and knowing or being willfully blind to the fact that the acts they induce infringe the ’939 Patent. Accordingly, Defendants specifically intend for others including their customers and end users to directly infringe one or more claims of the ’939 Patent in the United States, and it is a reasonable inference that Defendants specifically intended to induce that infringement because Defendants

had knowledge of the ’939 Patent and actively induced others to directly infringe it.

43. Defendants also contributorily infringe one or more claims of the ’939 Patent, including at least claim 30, in violation of 35 U.S.C. § 271(c). Defendants sell and offer to sell within the United States, and/or import into the United States, the Accused Products, including individual Wi-Fi 7 routers, mesh nodes, and range extenders that customers combine with additional nodes and extenders to form and use the claimed apparatus, knowing that they constitute a material part of the invention claimed in the ’939 Patent and that they are especially made and especially adapted for use in infringing the ’939 Patent. The Accused Products are not staple articles or commodities of commerce suitable for substantial non-infringing use: they are purpose-built Wi-Fi 7 devices whose Wi-Fi 7 radios and multi-link coordination logic are designed, certified, marketed, and sold to establish and coordinate multiple Wi-Fi links in the manner claimed. And that functionality has no substantial use other than the infringing one. That the Accused Products may also perform other, separable functions such as wired Ethernet switching does not make them staple articles. Defendants have known of the ’939 Patent, and have known that the Accused Products are especially made and especially adapted for use in infringing it, at least since the filing and service of this Complaint, and they nonetheless continue to sell and offer to sell the Accused Products.

44. Defendants’ continued sale, offer for sale, use, and importation of the Accused Products after receiving notice of the ’939 Patent and of the specific infringement identified in Exhibit 2 is knowing, deliberate, and intentional or at a minimum, in reckless disregard of Vivato’s patent rights, and it constitutes willful infringement of the ’939 Patent. Vivato is therefore entitled to enhanced damages under 35 U.S.C. § 284 for Defendants’ infringement of the ’939 Patent, and to a finding that this case is exceptional under 35 U.S.C. § 285.

45. By making, using, offering for sale, selling and/or importing into the United States the Accused Products, and by inducing and contributing to the infringement of others, Defendants have injured Vivato and are liable for infringement of the ’939 Patent pursuant to 35 U.S.C. § 271.

46. As a result of Defendants’ infringement of the ’939 Patent, Vivato is entitled to monetary damages in an amount adequate to compensate for Defendants’ infringement, but in no event less than a reasonable royalty for the use made of the invention by Defendants, together with interest and costs as fixed by the Court.

47. The asserted claims of Vivato’s ’939 Patent are valid, enforceable, and directed to patent-eligible subject matter.

48. Defendants have had actual notice of the ’939 Patent and of their infringement since at least the filing and service of this Complaint, which constitutes notice under 35 U.S.C. § 287(a). Vivato seeks damages for infringement before that date to the extent permitted by 35 U.S.C. § 287.

## PRAYER FOR RELIEF

WHEREFORE, Vivato respectfully requests that this Court enter:

a. A judgment in favor of Vivato that Defendants have infringed, directly and indirectly, either literally and/or under the doctrine of equivalents, the ’939 Patent, and that the asserted claims of the ’939 Patent are valid, enforceable, and patent-eligible;

b. A judgment and order requiring Defendants to pay Vivato its damages, costs, expenses, and pre-judgment and post-judgment interest for Defendants’ infringement of the ’939 Patent, in an amount no less than a reasonable royalty;

c. A judgment and order requiring Defendants to provide an accounting and to pay supplemental damages to Vivato, including without limitation, pre-judgment and post-judgment interest, and an award of an ongoing royalty for Defendants’ post-judgment infringement in an

amount according to proof;

d. A judgment that Defendants' infringement of the '939 Patent has been willful, and an award of enhanced damages pursuant to 35 U.S.C. § 284;

e. A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Vivato its reasonable attorneys' fees and costs against Defendants;

f. Any and all injunctive and/or equitable relief to which Vivato may be entitled including without limitation ongoing royalties with respect to Defendants' infringement; and

g. Any and all other relief as the Court may deem appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

Vivato, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any issues so triable by right.

Dated: November 19, 2026

Respectfully submitted,

*/s/ Reza Mirzaie*

Reza Mirzaie (CA SBN 246953)
rmirzaie@raklaw.com
Paul A. Kroeger (CA SBN 229074)
pkroeger@raklaw.com
Philip X. Wang (CA SBN 262239)
pwang@raklaw.com
James N. Pickens (CA SBN 307474)
jpickens@raklaw.com
Ryan K. Lundquist (CO Bar No. 56449)
rlundquist@raklaw.com
Adam Hoffman
ahoffman@raklaw.com
Jacob Buczko

jbuczko@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Phone: (310) 826-7474

***Attorneys for Plaintiff XR Communications LLC dba Vivato Technologies***